# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **W&T OFFSHORE, INC.** | : | **DOCKET NO. 14-cv-2449** |
| **VERSUS** | : | |
| | | **UNASSIGNED DISTRICT JUDGE** |
| **S.M.R. JEWELL, SECRETARY,** | : | |
| **UNITED STATES DEPARTMENT** | | |
| **OF INTERIOR; ET AL.** | : | **MAGISTRATE JUDGE KAY** |

## REPORT AND RECOMMENDATION

Before the court are Motions for Summary Judgment [docs. 22, 26] filed, respectively, pursuant to Rule 56 of the Federal Rules of Civil Procedure by plaintiff W&T Offshore, Inc. ("W&T") and defendants S.M.R. Jewell, former Secretary of the United States Department of the Interior ("DOI"), and Gregory J. Gould, Director of the Office of Natural Resources and Revenue ("ONRR") of the Department of the Interior (collectively, "federal defendants"). Both motions are opposed. Docs. 26, 90. Also before the court is W&T's Motion to Strike Extra-Record Material [doc. 97], pertaining to citations in the federal defendants' reply [doc. 96] to W&T's amended memorandum [doc. 90] in opposition to the federal defendants' Motion for Summary Judgment [doc. 26] and reply in support of its own Motion for Summary Judgment [doc. 22]. The federal defendants oppose the Motion to Strike. Doc. 99.

For the following reasons, **IT IS RECOMMENDED** that the Motion to Strike [doc. 97] be **GRANTED**, that W&T's Motion for Summary Judgment [doc. 22] be **GRANTED IN PART** and **DENIED IN PART**, as described below, and that the federal defendants' Motion for Summary Judgment [doc. 26] likewise be **GRANTED IN PART** and **DENIED IN PART**.

# I.
## BACKGROUND

This case arises as a request for judicial review by W&T of a final decision ("final DOI decision") by the Interior Board of Land Appeals ("IBLA"), *W&T Offshore, Inc.*, 184 IBLA 272 (Feb. 11, 2014). Doc. 1. In that decision the IBLA affirmed the ruling of the Director of the ONRR, denying W&T's challenges to the methodology applied by DOI for resolving amounts owed from final delivery imbalances upon the end of W&T's participation in DOI's Royalty in Kind ("RIK") program.

Under the RIK program, which began following a series of pilot sales in 1998 and dramatically expanded until 2007, the Minerals Management Service (a DOI subagency and predecessor of ONRR) expanded its ability to receive royalties "in kind" rather than "in value" from oil and gas companies operating on federal leases.[1] WT001348–49.[2] Throughout the existence of the RIK program, DOI never promulgated regulations for its administration. However, it did provide guidance to participating companies, primarily through two "Dear Operator" letters issued in 2000 and 2005, respectively, and through a section of the Minerals Revenue Reporter Handbook issued by MMS in 2003. WT000009–10; *see* WT001426–38 (September 2000 letter); WT001526–32 (September 2005 letter); WT001124–28 (handbook section).

W&T began participating in the RIK program as the Facility Measurement Point ("FMP") operator of certain offshore leases, collectively known as the "EC373 Leases," in November 2001. WT000006, n. 7; *see also* doc. 1, p. 7. Over the course of its participation relative to the EC373 leases W&T overdelivered the volume of natural gas due in some months and underdelivered in

---

[1] Up to the mid-1990s, MMS mostly collected such royalties in value, save for limited exceptions. *See* WT001348. In the mid-1990s, however, it began to study whether the federal government might benefit from collecting royalties in kind in additional circumstances and then expanded its ability to do so under the RIK program as described above. *Id.*

[2] Citations beginning with "WT" refer to the administrative record, maintained on disc in the clerk's office of the presiding judge.

others.[3] *See, e.g.*, WT000006; WT001443–44; WT000184. DOI terminated its election to receive royalties in kind from the EC373 leases on October 31, 2008, reverting to receipt of royalty in value and causing the imbalance to become fixed for accounting purposes. *E.g.*, WT000006; WT001443–44. In September 2009, the Secretary of the Interior announced the phase-out of the RIK program as a whole. WT000005.

On March 16, 2010, MMS issued to W&T an order to pay $1,649,529.51 in additional royalties for the EC373 leases for production months February 2003 through October 2008. WT000198–203. The order stated that it was based on the Royalty Simplification and Fairness Act of 1996 and the Federal Oil and Gas Royalty Management Act of 1982, and that it superseded all Dear Operator letters "involving the resolution of operator imbalances on oil and gas production related to properties that are or have been in RIK." *Id.* at WT000199. The order also indicated that MMS would compute late-payment charges (i.e., interest) and bill W&T accordingly after it had received payment under that order. WT000200. A second order was issued on December 7, 2010, by MMS's successor agency, ONRR, requiring W&T to pay an additional $74,049.01 in royalties on the EC373 leases for production months February 2008 through September 2008. WT000347–52. W&T filed an unsuccessful appeal of these orders with ONRR Director Gregory J. Gould. WT000037–60. The ONRR concluded that W&T paid the principal amount owed under the March 2010 order prior to the appeal but W&T was assessed $673,516.99 in late-payment interest. WT000037. W&T appealed to the IBLA, which affirmed the ONRR Director's decision in the final DOI decision, referenced *supra*. WT00001–35.

---

[3] W&T asserts that it did not have control of all of the causes underlying delivery imbalances. Doc. 90, p. 17. To this end it notes that in some cases the third party with whom DOI had contracted to sell its RIK volumes failed to take the RIK volumes that W&T tendered, resulting in an underdelivery not caused by W&T. *Id.*; *see* WT001285. The federal defendants maintain that "[a]ny reasonable examination of the history of deliveries from the EC373 leases" shows that W&T never attempted to resolve its imbalances. Doc. 96, p. 8; *see* WT000184. We make no judgment as to the cause of these imbalances or the plaintiff-appellant's diligence in resolving them and instead rely merely on the record evidence of their existence

W&T now seeks judicial review in this court of the final DOI decision through a complaint for declaratory and injunctive relief. Generally, it continues to challenge the methodology through which final imbalances were calculated upon termination of its participation in the RIK program. *Id.* It now moves for summary judgment, raising the following challenges in particular:

1. The final DOI decision unlawfully contradicts the OCSLA and DOI regulations.
2. Regardless of how RIK delivery imbalances are resolved, DOI must give W&T credit for all deliveries to DOI during the period of DOI's RIK election for the EC373 leases.
3. DOI's retroactive application of a new, industry-wide method for resolving RIK delivery imbalances violates APA rulemaking requirements and the fair notice doctrine
4. W&T has no liability to DOI for underdeliveries attributable to lease interests owned by other lease/unit owners
5. The final DOI decision is not supported by the administrative record.

Doc. 22, att. 2. The federal defendants likewise move for summary judgment, opposing all of the claims raised above. Doc. 26, att. 2. W&T also requests that this court strike exhibits in the federal defendants' reply brief, or alternatively take judicial notice of a pending administrative appeal. Doc. 97.

## II.
### LEGAL STANDARDS

#### A. *Summary Judgment*

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2553 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine issue of material

fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

Once the movant makes this showing, the burden then shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2510 (1986). The burden requires more than mere allegations or denials of the adverse party's pleadings. The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law. *Celotex*, 106 S.Ct. at 2553. There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014). Furthermore, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S.Ct. 2097, 2110 (2000). However, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 106 S.Ct. at 2511.

### B.  *Review of Agency Determinations under the APA*

When a party seeks review of an agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the district court serves "as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). It is the agency's role to resolve factual issues and arrive at a decision supported by the administrative record, while the district court must determine whether, as a matter of law, "the evidence in the administrative record permitted the agency to make the decision it did." *Stuttering Found. Of Am. v. Springer*, 498 F.Supp.2d 203, 207 (D.D.C. 2007) (quotations omitted). Thus, "[s]ummary judgment . . . serves as the mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

> Under the APA, in relevant part, a court will overturn an agency action if it is:
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of the procedure required by law.

5 U.S.C. § 706(2).

The party challenging the agency's action bears the burden of showing that the agency's determination was arbitrary and capricious. *La. Pub. Serv. Comm'n v. F.E.R.C.*, 761 F.3d 540, 558 (5th Cir. 2014). As the federal defendants emphasize, arbitrary and capricious review is "narrow" and we may not substitute our own judgment for that of the agency. *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 260 (5th Cir. 2012). Instead, "[w]e limit our review to whether the agency articulated a rational connection between the facts found and the decision made, and it is well-settled that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* (quoting *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 380 (5th Cir. 2008)). Nonetheless, the agency is still required to "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Manf. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.*, 103 S.Ct. 2856, 2866 (1983); *see Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994).

### III.
### APPLICATION

#### A. *Motion to Strike*

The Motion to Strike relates to two exhibits attached by the federal defendants to their reply in support of their Motion for Summary Judgment. *See* doc. 96. Exhibit 1 contains correspondence between a W&T employee and MMS employees from March and April 2009. *See* doc. 96, att. 1.

Exhibit 2 is a communication from an MMS employee to a W&T employee dated December 2008. *See* doc. 96, att. 2. Both are cited in the reply memorandum to show that W&T was aware of and complied with portions of the methodology for resolving RIK imbalances prior to its alleged unveiling in the orders to pay at issue here. *See* doc. 96, pp. 6–7, n. 2. In their opposition to the Motion to Strike, the federal defendants contend that these documents show that W&T accepted the agency's methodology for resolving RIK imbalances when it benefitted W&T to do so,

W&T now moves to strike the exhibits as extra-record evidence or, in the alternative, for this court to take judicial notice of its pending administrative appeal ONRR's 2015 denial of a refund demand issued by W&T. Doc. 97, att. 1. The Administrative Procedure Act, *supra*, only permits non-statutory judicial review of final agency actions. *Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994) (citing 5 U.S.C. § 704). Under the "record rule," review of agency action in a district court is generally limited to the administrative record before the agency. *Sierra Club v. Peterson*, 185 F.3d 349, 369–70 (5th Cir. 1999); *see State of Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 327 n. 8 (5th Cir. 1988) ("Agency action is to be upheld, if at all, on the basis of the record before the agency at the time it made its decision.") (citation omitted). The final agency action in this matter is the final DOI decision. Here, therefore, the record is a matter of what was before the IBLA when it rendered its decision in 2014.

The federal defendants do not refute that their exhibits are extra-record material, but instead offer that the court may consider them as an exception to the record rule in order "to provide context in understanding the scope of inconsistencies found in W&T's arguments, as opposed to the agency's consistent application of the statute." Doc. 99, p. 2. They rely on the Fifth Circuit recognition of certain exceptions to the record rule, including when the court needs "to supplement the record with 'background information' in order to determine whether the agency considered all

of the relevant factors." *Medina County Environmental Action Association v. Surface Transport Board*, 602 F.3d 687, 706 (5th Cir. 2010) (citing *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)) (emphasis added). The government fails to show, however, that W&T's inconsistent acceptance of its methodologies is sufficiently relevant to the DOI's considerations on review of this matter. Accordingly, the Motion to Strike should be **granted** as to Exhibits 1 and 2 to Docket Entry 96 and portions of that memorandum citing to those exhibits. Having recommended that W&T's Motion to Strike be granted, we decline to consider its alternative request for judicial notice of a pending administrative appeal.

In its opposition to the Motion to Strike, the federal defendants request that the court "strike and disregard all portions of W&T's briefs citing to extra-record materials." Doc. 99, p. 4.  The request does not provide us with sufficient information to identify the extra-record information or arguments based on same at issue. Moreover, it was cursorily asserted for the first time in a response to W&T's motion to strike and therefore is not properly before the court due to the federal defendants' failure to raise it in a separate motion. *See, e.g.*, *Santoli v. Village of Walton Hills*, 2015 WL 1011384, *8 n. 3 (N.D. Ohio Mar. 3, 2015). Accordingly, this request is not addressed.

## B.  Motions for Summary Judgment

As noted above, W&T challenges the final DOI decision on a number of bases, each of which the federal defendants refute and each of which we now review under the standards set forth above.

### 1.  Whether the final DOI decision unlawfully contradicts OCSLA and DOI regulations

W&T first alleges that the final DOI decision contradicts both the Outer Continental Shelf Lands Act of 1953 ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, as well as DOI regulations. Specifically, it contends that DOI is bound by its statutory election to take royalties in kind. Alternatively, it

alleges that, under DOI regulations and even in the event cash balancing is required, the cash-out methodology should be based on volumes and values at the end of the RIK period and that interest did not accrue during the RIK period. Finally, it maintains that the final DOI decision contradicts DOI valuation regulations.

### a. Whether DOI is statutorily bound by its election to take royalties in kind

In this matter the federal defendants justify their RIK imbalance methodology as arising from various statutes, including OCSLA and the Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. §§ 1701 *et seq.*,  In reviewing an agency's construction of a statute it administers, the court must first determine

> [w]hether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 104 S.Ct. 2778, 2781–82 (1984) (footnotes omitted). In "evaluating the clarity of Congressional direction," the court should apply the "traditional tools of statutory interpretation, including text, structure, purpose, and legislative history." *BNSF Railway Co. v. United States*, 775 F.3d 743, 751 (5th Cir. 2015) (internal quotations omitted). Words may not be interpreted in isolation, and the statute should instead be viewed as part of "a symmetrical and coherent regulatory scheme." *Id.* (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 120 S.Ct. 1291, 1294 (2000)).

Under the second prong, if the court determines that Congress has not addressed the precise issue, it does not simply impose its own construction on the statute. *Id.* (citing *Chevron*, 104 S.Ct. at 2781–82). Instead, considerable deference ("*Chevron* deference") is accorded to the agency's

interpretation "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Dhuka v. Holder*, 716 F.3d 149, 155 (5th Cir. 2013) (quoting *United States v. Mead Corp.*, 121 S.Ct. 2164, 2171 (2001)).

The OCSLA provision at issue allows DOI to collect royalties "in amount **or** value." *See* 43 U.S.C. § 1337(a)(1)(A)–(H) (emphasis added). W&T maintains that "Congress's use of the term 'or' makes clear that OCSLA requires DOI to make an election among mutually-exclusive alternatives," and that "Congress did not authorize DOI to collect royalties both 'in amount *and* value.'" Doc. 22, att. 2, p. 22 (emphasis in original). Specifically, W&T asserts that "or" is intended disjunctively rather than conjunctively, prohibiting DOI from demanding royalties for the same production period in both amount and value, and that DOI may only change its election prospectively rather than retroactively. *Id.* at 24–25. Accordingly, it contends that DOI's orders for W&T to resolve an outstanding obligation to deliver gas volumes by making a cash payment violate the OCSLA as DOI is bound by its initial election to take royalties in kind rather than in value for that period. *Id.* at 22–23.

The federal defendants maintain, as the IBLA determined, that the Secretary of the Interior has clear statutory authority to determine whether royalties are owed in kind or in value, and that nothing in the OCSLA, its implementing regulations, or any other statute "provides that once the Secretary elects to take royalties in kind, the Secretary is barred from later taking royalties in value to satisfy an outstanding royalty deficiency."[4] Doc. 26, att. 2, pp. 22–23; WT000012–14; *see* 30

---

[4] They also maintain that "the plain words and context of OCSLA" as well as subsequent legislation and regulations "grant the Secretary complete discretion to choose whether to take royalties in kind or in value." Doc. 26, att. 2, p. 24. We note, as W&T points out, that subsequent legislation is a "hazardous basis" from which to gauge the intent of an earlier Congress. *Wesson v. United States*, 48 F.3d 894, 901 (5th Cir. 1995) (citing *United States v. Price*, 80 S.Ct. 326, 332 (1960)). Accordingly, we disregard arguments based on subsequent legislation (namely, FOGRMA, *supra*) in order to discern Congress's intent under the OCSLA.

C.F.R. § 1218.150(a) (2010) (likewise obligating lessee to pay royalties in value or deliver in production royalties in the amount determined by the ONRR, but making no mention that ONRR or DOI's election to take royalties in kind or in value was binding).

Based on the above, we agree with the federal defendants. The use of "or" in the above-cited provisions of the OCSLA may be enough to show, as W&T contends, that DOI cannot demand payments of royalties in kind and in value at once; however, it is not sufficiently unambiguous to evince Congress's intent, within the royalty scheme set out under the OCSLA, that DOI be bound by its election such that it is prevented from demanding that an imbalance of a payment due in kind be resolved instead in cash. Accordingly, Congress has not spoken to the precise question at issue and we must instead determine whether DOI's interpretation, that the Secretary may demand payment in value to satisfy an outstanding deficiency of royalties owed in kind, is based on a permissible construction of its statutory authority as a whole.

To this end the federal defendants point to provisions of FOGRMA, supra. FOGRMA was enacted to provide the Secretary of the Interior with expanded authority to audit and enforce royalty payment obligations on federal leases. 30 U.S.C. § 1701. Under FOGRMA, the Secretary is directed to audit and reconcile lease accounts and ONRR is authorized to "take appropriate actions to make additional collections or refunds as warranted." *Id.* at § 1711(c)(1). The act goes on to provide that,

> [i]n order to increase receipts and achieve effective collections of royalty and other payments, a lessee who is required to make any royalty or other payment under a lease or under the mineral leasing laws, **shall make such payments in the time and manner as may be specified by the Secretary** . . . .

*Id.* at § 1712(a) (emphasis added). Accordingly, the Secretary has discretion to determine the manner of payments made to resolve imbalances for royalties owed under OCSLA. Coupled with

our finding above that OCSLA's authorization for DOI to collect royalties in "amount or value" does not mean that DOI is bound to that election with regard to satisfying delivery imbalances on those royalties, there is no call for finding that DOI has unreasonably interpreted these statutes by allowing the demands for payment in value related to the delivery imbalances on royalties in kind at issue here. Accordingly, without exploring the federal defendants' arguments relating to how widespread the practice of resolving in-kind imbalances through cash payments is and the extent to which W&T has acquiesced to that practice, we find that W&T has not carried its burden on this claim.

### b.   Whether the final DOI decision violates DOI royalty regulations with respect interest assessment

Alternatively, W&T contends that the final DOI decision must be overturned as it violates the agency's regulations relating to royalties. Its first allegation under this claim, that the only cash-out methodology consistent with the RIK election must be based on volumes and values at the end of the RIK period, is based on the same arguments set forth under the previous claim. Doc. 22, att. 2, pp. 28–29. We therefore decline to consider it anew and proceed to W&T's argument that the final DOI decision violated royalty regulations by allowing interest to accrue on late or deficient royalty in kind deliveries prior to the end of W&T's participation in that program. *See id.* at 29–30.

"It is elementary administrative law that an agency must operate within the confines of its own regulations." *American Petrol. Inst. v. E.P.A.*, 787 F.2d 965, 975 (5th Cir. 1986). In *Auer v. Robbins*, 117 S.Ct. 905 (1997), the Supreme Court held that an agency's interpretation of its own ambiguous regulation is generally entitled to deference; however, *Auer* deference is not warranted where the regulation's language is unambiguous. *Christensen v. Harris County*, 120 S.Ct. 1655, 1663 (2000). It is also unwarranted when the agency's interpretation is "plainly erroneous or

inconsistent with the regulation," or "when there is reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter." *Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2166 (2012) (internal quotations omitted). Additionally, courts should not defer to agency interpretation when doing so "would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct a regulation prohibits or requires.'" *Id.* at 2167 (quoting *Gates & Fox Co. v. Occupational Safety and Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.)) (alterations omitted).

The regulation at issue here is one promulgated pursuant to FOGRMA, setting the standards for royalties, net profit shares, and rental payments. *See* 30 C.F.R. § 1218.150. The federal defendants point to Congress's directive under FOGRMA that "the Secretary **shall** charge interest" on late payments or underpayments of royalties on oil and gas leases, with no explicit restriction under the statute as to whether the royalties are taken in kind or in value. 30 U.S.C. § 1721(a). Accordingly, they argue that the regulation does not impose a limitation of interest charges on royalties in value, as doing so would violate the seeming imperative in the statute that interest be charged regardless of the type of royalty owed. However, W&T contends that the agency's longstanding interpretation of that statute, as reflected in § 1218.150, excluded RIK deliveries from the collection of interest for late and/or deficient payments. Specifically, it points to the fact that ONRR is authorized to assess a late payment charge (e.g., interest) when a lessee fails to make "timely or proper payment of any **monies**."[5] 30 C.F.R. § 1218.150(b) (emphasis added). As W&T observes, the language of this regulation tracks with the distinction in FOGRMA

---

[5] The federal defendants note that, under 30 C.F.R. § 1218.150(d), "[l]ate payment charges apply to *all* underpayments and payments received after the date due" and include "assessments that a lessee/operator/payor/permittee/*royalty taken-in-kind* purchaser is required to pay by a specified date." Doc. 26, att. 2, p. 30 (emphasis added by federal defendants). However, as W&T points out, this provision speaks of RIK "purchasers" and not lessees or producers of in-kind royalties. Doc. 90, p. 26. Accordingly, § 1218.150(d) does not show explicit application of that regulation's provisions to late or deficient payments of royalties in kind.

between a lessee's duty "to deliver oil or gas royalty in kind" and its duty "to pay, offset or credit monies including . . . the principal amount of any royalty." 30 U.S.C. § 1702(25)(B)(i)–(ii).

The September 2000 Dear Operator letter provided that "ordinary imbalances" would be made up at the cessation of the RIK term or cessation of production, but did instruct the operator, "in extraordinary imbalance situations," to "work . . . with the Lessor to reach mutually acceptable methods of imbalance resolution." WT001428–29. It also only provided for interest accruing "from 60 days after the final month of delivery." *Id.* The relevant section of the 2003 Minerals Revenue Reporter Handbook likewise provided that, upon cash-out, interest would accrue on imbalances "from 60 days after the final month of delivery." WT001128. The September 2005 Dear Operator letter, however, provided that interest would accrue on unpaid royalties "from the end of the month following the month of production" in both routine and extraordinary imbalance situations, and for imbalances remaining upon cessation of the RIK term. WT001529–30.

Section 1218.150(b) appears to be unambiguous as to the precise issue at hand, as it speaks specifically to interest being assessed for failure to make payments of monies. Under the principle of *expressio unius est exclusio alterius* and the guiding language from FOGRMA distinguishing between deliveries in kind and payments of monies, payment or delivery of a royalty in kind is thereby excluded and so interest could not have begun to accrue on royalties-in-kind until they were cashed out and became due in value. Moreover, DOI's interpretations of that provision, as described above, were at best inconsistent. Accordingly, even if the regulation were found to be ambiguous, DOI's interpretation would not be entitled to *Auer* deference due to the affront it creates to "the principle that agencies should provide regulated parties 'fair warning of the conduct a regulation prohibits or requires.'" *SmithKline Beecham Corp.*, *supra*, 132 S.Ct. at 2167.

-14-

DOI's interpretation is thus "entitled to respect, but only to the extent it has the power to persuade." *Texas v. United States*, 201 F.Supp.3d 810, 833 (N.D. Tex. 2016) (citing *Christensen v. Harris Cty.*, 120 S.Ct. 1655 (2000)). For the reasons stated above, we do not find DOI's interpretation persuasive, nor do we find § 1721(a) clear enough to mandate interest on royalties in kind despite DOI's regulatory interpretation to the contrary. Although the 2005 Dear Operator letter had been the final interpretative word on the accrual of interest for some time at the cessation of W&T's RIK term, the unambiguous and contrary wording of the regulation and the multiple shifts in interpretation from DOI up to that point lend that interpretation little reliability. W&T has succeeded in showing that the final DOI decision was arbitrary and capricious in this regard, and should be reversed and remanded to the extent that it upheld accrual of interest on royalties in kind owed on the EC373 leases prior to the end of their participation in that program.

Alternatively, W&T contends that interest could not begin to accrue under 31 U.S.C. § 3717(b)(2) before the agency mailed notice of the amount due to the debtor. The federal defendants do not address this claim; however, it is readily disposed of here. The provision relied upon by W&T only refers to interest under § 3717(a). *Id.* at § 3717(b). Therefore, regardless of the fact that W&T has not even shown that this claim was raised before the IBLA, it could not show that the statute was applicable to the date interest began accruing in this matter.

### c.  Whether the final DOI decision contradicts DOI's valuation regulations

W&T next alleges that the final DOI decision contradicts DOI valuation regulations by ordering W&T to value the delivery imbalance according to the prices that DOI received for its sale of the RIK volumes. Instead, W&T points to 30 C.F.R. § 1202.150(a), which states in pertinent part that: "When paid in value, the royalty due shall be the value . . . determined pursuant to 30 CFR part 1206 of this title multiplied by the royalty rate in the lease." Thus, W&T contends that

if it owes a cash payment to resolve the final RIK delivery imbalance, the amount due should be determine pursuant to 30 C.F.R. § 1206. Doc. 22, att. 2, p. 31. It also notes that, under that regulation, royalty is typically owed based on the value that the lessee receives when the **lessee**, rather than DOI, receives when it sells the production in question. *Id.*; *see, e.g.*, 30 C.F.R. § 1206.152 (valuation standards for unprocessed gas).

As the federal defendants point out, the regulations relied on by W&T contemplate instances where the royalties are owed in value in the first place – not the valuation of underdeliveries of royalties in kind. Here, the IBLA held that ONRR was "entitled to recover *the value* of the additional gas that should have been delivered," and that "[u]nless the imbalance is valued at the contract sales price, ONRR would not receive the equivalent of what it would have received had W&T delivered the full RIK on time and the United States been able then to sell the gas at that price." WT000030. W&T fails to show that the final DOI decision contradicts any regulation or is otherwise arbitrary and capricious with respect to this claim.

## 2. Whether DOI erred by failing to give W&T credit for all deliveries during RIK election for EC373 leases

W&T next contends that, regardless of how the RIK delivery imbalance is resolved, DOI must calculate imbalances for the full term of the EC373 leases' participation in the RIK program (November 2001 through October 2008). Doc. 22, att. 2, pp. 31–35. As W&T shows, the refusal to credit deliveries from November 2001 through the end of January 2003 is significant because, as of that date, W&T had overdelivered RIK volumes by a total of 33,355 Mmbtu on the EC373 leases. *See* WT001443–44. The March 2010 payment order reflected a net underdelivery volume of around 200,000 Mmbtu owed for the accounting period of February 2003 through October 2008. WT000198. Thus, W&T argues that in failing to credit deliveries from November 2001 through January 2003, DOI has exceeded its statutory authority, or alternatively violated the doctrine of

equitable recoupment, or by further alternative violated Louisiana law authorizing offsetting. Doc. 22, att. 2, pp. 31–35.

### a. Statutory authority

The Royalty Simplification and Fairness Act of 1996 ("RSFA") amended FOGRMA, in relevant part, to set a seven-year statute of limitations on judicial proceedings or demands arising from or relating to an obligation under that statute. 30 U.S.C. § 1724(b). Accordingly, the IBLA held that ONRR properly refused to consider production imbalances that occurred more than seven years before the March 2010 order.[6] WT000023–26.

W&T contends that the final DOI decision ignores another RSFA provision, which states that:

> An adjustment or request for a refund for an obligation may be made after the adjustment period only upon written notice to and approval by the Secretary . . . during an audit of the period which includes the production month for which the adjustment is being made. If an overpayment is identified during an audit, then the Secretary . . . shall allow a credit or refund in the amount of the overpayment.

30 U.S.C. § 1721a(a)(3). The federal defendants point out that there is a six-year limitations period under this section for seeking adjustments. *See id.* at § 1721a(a)(4). W&T argues that the limitation does not apply to seeking refunds based on an audit and that Section 1721a(a)(3) mandates that W&T be credited for the overpayment. Doc. 90, p. 24. Contrary to what W&T asserts, however, it is not undisputed that DOI identified overpayments from November 2001 through the end of January 2003 in its review. The administrative record does reflect that MMS auditors gathered data on the EC373 leases for the entire RIK period. *See* WT001560. However, the scope of their review, as described by the IBLA, was the seven-year statutory period set out in 30 U.S.C. §

---

[6] Under FOGRMA, as amended by RSFA, the IBLA noted, obligations become due when the right to enforce an obligation is fixed, and a royalty obligation is fixed "on the last day of the calendar month following the month in which oil or gas is produced." WT000024, n. 16 (citing 30 U.S.C. § 1724(b)–(c) (2006)).

1724(b). WT000025–26. W&T has not shown that overpayments from outside this period were identified in the audit and therefore fails to show that DOI's decision in this regard was arbitrary and capricious or outside of its statutory authority.

### b.  Equitable recoupment

W&T asserts in the alternative that ONRR should have considered pre-February 2003 overdeliveries under the common law doctrine of equitable recruitment. In the final DOI decision, the IBLA noted that the statute of limitations under § 1724(b)(1) applied to equitable as well as legal remedies, "whether arising under statute or common law," and held that ONRR was therefore barred from offsetting any RIK net overpayment occurring before February 2003 against net underpayments occurring thereafter. WT000026.

W&T notes that it is asserting equitable recoupment as a defense, rather than as an action or demand. Doc. 90, pp. 24–25. It points out that the Supreme Court has held that an equitable recoupment defense is "never barred by the statute of limitations so long as the main action itself is timely." *Bull v. United States*, 55 S.Ct. 695, 700–01 (1935). More recently, the Fifth Circuit affirmed that

> Recoupment is a defense that goes to the foundation of a plaintiff's claim by deducting from plaintiff's recovery all just allowances or demands accruing to the defendant with respect to the same contract or transaction. As a purely defensive procedure, it is available to defendant so long as plaintiff's claim survives-even though an affirmative action by defendant is barred by limitations.

*Distrib. Svcs., Ltd. v. Eddie Parker Interests, Inc.*, 897 F.2d 811, 812 (5th Cir. 1990) (citations omitted). The Fifth Circuit went on to hold that a counterclaim for cargo damages brought under the doctrine of recoupment was not barred by the statute of limitations within the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1303(6), even though asserted after that statute's one-year time period. *Id.* at 813. The same holds true here, and so § 1724(b) could not serve to bar

W&T's claim for recoupment. By refusing to consider all overdeliveries under this doctrine, DOI acted arbitrarily and capriciously, and the decision should therefore be reversed and remanded with respect to this claim. Therefore there is no need to consider W&T's alternative argument with respect to state law.

### 3. Whether DOI's retroactive change violated APA rulemaking requirements and the fair notice doctrine

W&T next contends that the methodology adopted by DOI for resolving RIK imbalances, on which it based its demands for cash payment in 2010, differed drastically the methodology that "DOI had assured the regulated community would apply" over the course of its administration of the RIK program. Doc. 22, att. 2, p. 35. Accordingly, it claims that DOI violated APA rulemaking requirements when it adopted the new methodology without providing notice and an opportunity for comment, and by these same actions violated the doctrine of fair notice.

#### a. Whether DOI violated APA rulemaking requirements

The APA establishes the procedures that federal agencies must use for rulemaking, which is defined as the process of "formulating, appealing, or amending a rule." *See* 5 U.S.C. § 551(5). When an agency implements a rule of a legislative or substantive nature, it must use notice and comment procedures in its rulemaking. *Cove Associates Joint Venture v. Sebelius*, 848 F.Supp.2d 13, 26 (D.D.C. 2012); *see* 5 U.S.C. § 553(b)–(e) (notice and comment procedures). Congress designed these procedures to "ensure that the broadest base of information [will] be provided to the agency by those most interested and perhaps best informed on the subject of the rulemaking at hand." *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994). A legislative rule "can be broadly characterized as an agency action that 'purports to impose legally binding obligations or prohibitions on regulated parties' or 'sets forth legally binding requirements for a private party to' obtain a benefit." *Nio v. U.S. Dep't of Homeland Security*, --- F.Supp.3d ---, 2017 WL 3917006,

*11 (D.D.C. Sep. 6, 2017) (quoting *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014)).

The notice and comment requirement does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). "Although at times elusive, this dividing line is an essential one." *Mountain States Health Alliance v. Burwell*, 128 F.Supp.3d 195, 205 (D.D.C. 2015). Otherwise, "the purpose of the APA would be disserved if an agency with a broad statutory command . . . could avoid notice-and-comment rulemaking simply by promulgating a comparably broad regulation . . . and then invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations." *Id.* (quoting *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011)). However, courts also recognize that:

> Notice and comment rulemaking is time-consuming, facilitates the marshaling of opposition to a proposed rule, and may result in the creation of a very long record that may in turn provide a basis for a judicial challenge to the rule if the agency decides to promulgate it. . . . Every governmental agency that enforces a less than crystalline statute must interpret the statute, and it does the public a favor if it announces the interpretation in advance of the enforcement, whether the announcement takes the form of a rule or of a policy statement, which the Administrative Procedure Act assimilates to an interpretive rule. It would be no favor to the public to discourage the announcement of agencies' interpretations by burdening the interpretive process with cumbersome formalities.

*Hoctor v. U.S. Dep't of Agriculture*, 82 F.3d 165, 167 (7th Cir. 1996). "The distinction is [thus] important for the agency, the regulated community, and the public in general." *Minott v. Sebelius*, 2013 WL 5487539 (S.D. Ind. Sep. 30, 2013). Contrary to the *Auer* and *Chevron* standards of deference described above, a court may consider an agency's characterization of its own rule for the purposes of determining whether that rule is exempt from notice-and-comment rulemaking

requirements, but is not required to defer to it. *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1056 (D.C. Cir. 1987).

An interpretative rule "must derive a proposition from an existing document whose meaning compels **or logically justifies** the proposition." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010) (emphasis added). The "critical feature" of interpretative rules is that "they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199, 1204 (2015) (quoting *Shalala v. Guernsey Memorial Hosp.*, 115 S.Ct. 1232 (1995)). "Because an agency is not required to use notice-and-comment procedures to issue an initial [interpretative] rule, it is also not required to use those procedures when it amends or repeals that . . . rule." *Id.* at 1206.

The final DOI decision as to this claim rested on the premise that the Dear Operator letters "should be viewed as guidance or policy documents." WT000017. The IBLA held that "[a]s statements of policy issued to guide ONRR in resolving imbalances at the end of the RIK Program, the letters do not embody a substantive rule that must be promulgated in accordance with the APA, as W&T argues." WT000017–19. Accordingly, ONRR was free to depart from the policy set by the Dear Operator letters and set new policy without notice and comment rulemaking. *Id.*

W&T maintains that DOI's "newly-minted methodology" reflected in the 2010 payment orders is an improperly promulgated legislative rule. Doc. 22, att. 2, pp. 38–39. To this end it relies in particular on *Hoctor*, *supra*. There the Seventh Circuit held that the Department of Agriculture's interpretative statement was actually a legislative act, and that an agency performs a legislative function when it makes "reasonable but arbitrary (not in the 'arbitrary or capricious' sense) rules that are consistent with the statute or regulation under which the rules are promulgated but not derived from it, because they represent an arbitrary choice among methods of implementation."

82 F.3d at 167–70; *see also Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494–96 (D.C. Cir. 2010) (relying on *Hoctor*).

W&T also relies on a more recent decision, *Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014). There the D.C. Circuit held that two of the Department of Labor's Training and Employment Guidance Letters ("TEGLs"), which updated procedures to establish the minimum wages and working conditions that employers had to offer American herders before hiring foreign herders, were legislative rules subject to APA notice and comment requirements. *Id.* at 1007, 1021–25. The court emphasized the federal defendants' inability to "point to any statute or regulation that creates substantive standards the TEGLs interpret," and noted that the TEGLs instead "provide the policy decision Congress omitted."[7] *Id.* at 1023 (quoting *Chamber of Commerce of U.S. v. OSHA*, 636 F.2d 464, 469 (D.C. Cir. 1980)) (alterations omitted).

In this matter the federal defendants purport to distinguish both *Hoctor* and *Mendoza* by arguing that the 2010 orders merely explain or interpret what OCSLA, FOGRMA and RSFA already require.[8] We agree. Any disagreement on the part of this court with those interpretations does not render the methodology legislative rather than interpretative. *See Cent. Tex. Tel. Co-op., Inc. v. F.C.C.*, 402 F.3d 205, 212 (D.C. Cir. 2005) ("If . . . a rule cannot be fairly viewed as

---

[7] W&T also relies on *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616 (5th Cir. 1994), in which the Fifth Circuit determined that an unpublished MMS procedure paper relating to royalty valuation criteria was improperly promulgated without notice and comment procedures. The court found that the procedure paper was "not an interpretative rule, as it does not purport to interpret a statute or regulation" and instead "effects a change in the method used by MMS in valuing [natural gas products]." *Id.* at 619–20. In that matter, however, the procedure paper announced a new valuation method, different from the one set forth by federal regulation. Here, as the federal defendants note, the methodology relied on in the orders only supplants what was set out in the Dear Operator letters and handbook, rather than any regulation. Accordingly, *Phillips* is readily distinguished from this matter.

[8] In the final DOI decision the IBLA noted that "nothing in OCSLA or FOGRMA, as amended by [RSFA], or their implementing regulations . . . **specifically** dictates how ONRR is to account for such imbalances" and that ONRR instead "selected an accounting method that was neither prohibited by, nor inconsistent with, statutory and regulatory authorities." WT000008–9 (emphasis added). It thus concluded that the Dear Operator letters "should be viewed as guidance or policy documents," and that the 2010 payment orders "constitute[d] a reasonable and rational method of carrying out the statutory mandate to collect the additional royalty determined to be due at the end of the RIK term." WT000017–19. Contrary to W&T's assertion, the argument above does not contradict the reasoning of the IBLA set forth here and thus should not be disregarded as a post-hoc rationalization.

interpreting—**even incorrectly**—a statute or a regulation, the rule is not an interpretive rule . . . .") (emphasis added).

As shown by the specific citations to OCSLA, FOGRMA, and RSFA by the federal defendants, the methodology at issue here is grounded in and logically justified by the specific statutory text.[9] Specifically, the federal defendants note the provisions requiring lessees to pay royalties in kind or value at or above a certain percentage (43 U.S.C. § 1337(a)(1)(A)), in the time and manner as specified by the Secretary (30 U.S.C. § 1712(a)), on a schedule for each production month (*id.* at § 1724(c)(2)). Doc. 26, att. 2, p. 39. They also note the provisions imposing a duty on the Secretary to collect those royalties and to collect interest on any late payments (30 U.S.C. §§ 1711(a), 1721(a)). Furthermore, as the IBLA emphasized through its reliance on *Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030 (D.C. Cir. 2008), inconsistencies between prior interpretations and the methodology applied in the orders are of no moment to the methodology's legislative-versus-interpretative nature, as all DOI sources from which W&T alleges a prior methodology were only interpretative in themselves.[10] *Id.* at 1038–40. Accordingly, W&T shows

---

[9] Meanwhile, *Hoctor* dealt with a statute authorizing the USDA to formulate standards for animal handling, "with minimum requirements for handling, housing, feeding, watering, sanitation, etc." 82 F.3d at 167 (quotations omitted). However, the statute offered no definition for these minimum standards and instead empowered the agency to create them. In *Mendoza*, moreover, the guidance letters created duties for employers rather than clarifying any preexisting duties under a statute. 754 F.3d at 1022. In this matter, on the other hand, DOI was bound by the statutes cited above to collect royalty payments, resolve imbalances, and collect interest on late or deficient payments. Accordingly, as the federal defendants note, these matters are distinguishable from the one before us by the lack of statutory or regulatory guidance.

[10] W&T disputes that the Dear Operator letters were non-binding, as it alleges that those letters were the source of DOI's election to take royalties in kind and thus triggered all of the rights and obligations at issue here. Doc. 90, p. 31. We disagree. It is the statutes cited above that impose the duties on the parties, which were then interpreted through Dear Operator letters and finally through the 2010 payment orders. W&T's reliance on *Phillips*, *supra*, is also misplaced. *Phillips* dealt with deviation from an existing rule that was consistently applied. 22 F.3d at 619–20. As the IBLA noted and the federal defendants now emphasize, the Dear Operator letters were inconsistent with each other and with ONRR's *Minerals Revenue Reporter Handbook* on the subject of imbalances on some though not all fronts, and this inconsistency was most notable with the 2005 Dear Operator letter's announcement, *supra*, that interest could be assessed during the RIK program.

no error to the final DOI decision under this claim and we need not consider the federal defendants' alternative argument that the rule actually flowed from an adjudication.

### b.  Whether DOI deprived W&T of "fair notice"

W&T next alleges that DOI violated the "fair notice" doctrine by failing to give it adequate notice of the change in agency policy contained in the 2010 payment orders. To this end it relies on *F.C.C. v. Fox TV Stations, Inc.*, 132 S.Ct. 2307 (2012), and *Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156 (2012). In both of those matters the Supreme Court set aside agency orders due to their failure to give the regulated parties adequate notice of a change in policy. We have already considered this argument with respect to the decision to retroactively charge interest for late/deficient payment of royalties in kind. W&T does not demonstrate under this claim what other portion of the payment orders might have represented a shift in policy of which it was deprived of fair notice, other than the need to preserve its right to recover overdeliveries, which we also addressed *supra* under the equitable recoupment claim. Accordingly, we decline to consider the argument any further.

### 4.  Whether W&T is liable for underdeliveries attributable to other lessees

W&T next contends that DOI erred by holding it accountable as designated operator for additional royalties owed on the EC373 leases. To this end it points to the following RSFA provision:

> **Notwithstanding any other provision of this chapter to the contrary, a designee shall not be liable for any payment obligation under the lease.** The person owning operating rights under the lease shall be primarily liable for its pro rata share of payment obligations under the lease. If the person owning the legal record title in a lease is other than the operating rights owner, the person owning the legal record title shall be secondarily liable for its pro rata share of such payment obligations under the lease.

30 U.S.C. § 1712(a). W&T does not dispute that it was designated operator for all of the EC373 leases but contends that it (1) did not own the entirety of the record title and/or operating rights in the leases and (2) did not own any interest whatsoever in some of the leases. The IBLA noted that, "[t]o the extent W&T was not the lessee or operating rights owner of certain of the Leases during the accounting period," it had no liability for additional royalty payments. WT000022.

W&T maintains that this acknowledgment is insufficient and that the 2010 payment orders should instead be invalidated. The federal defendants contend that the orders were still properly sent to W&T as designated operator of the EC373 leases. As they note, ONRR may properly issue a payment order to the designee, even if not liable, under 30 U.S.C. § 1702(23) and ONRR is also required to provide written notice to all lessees of record under that same statute. Accordingly, W&T fails to show grounds for invalidating the orders under this claim, as the orders do not actually make W&T liable for any payment on any lease for which it is only the designee.

### 5. Whether the final DOI decision is supported by the administrative record

Lastly, W&T contends that the entire final DOI decision should be vacated as unsupported by the record. Namely, it attacks the figures relied upon by DOI for values generated by DOI's sales of RIK volumes, and contends that DOI never provided any testimony or documentation to support these values. Doc. 22, att. 2, p. 46. The federal defendants respond that W&T never raised any concerns about the RIK sales volumes in response to this court's order in January 2015 that it "present any issues concerning the scope or content of the record" in a specified time, and in fact affirmed for the court that it was satisfied with the scope of the administrative record after the parties had reached an agreement on inclusion of other documents. Doc. 13, pp. 1–2; *see* doc. 17. W&T provides no excuse for its failure to raise this issue at any prior point. Accordingly, we agree that it is time-barred from seeking relief on this basis now.

## IV.
### CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that the Motion to Strike [doc. 97] be **GRANTED**, that W&T's Motion for Summary Judgment [doc. 22] be **GRANTED IN PART** and **DENIED IN PART**, as described above, and that the federal defendants' Motion for Summary Judgment [doc. 26] likewise be **GRANTED IN PART** and **DENIED IN PART**. As a result the 2010 payment orders should be vacated and the matter remanded to the Department of the Interior for the issuance of new payment orders consistent with this opinion as to the equitable recoupment and accrual of interest claims.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

THUS DONE this 23rd day of February, 2018.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE